

IN THE UNITED STATES DISTRICT COURT

FOR **THE** DISTRICT OF OREGON

| | |
|---|---|
| ASSOCIATION OF UNIT OWNERS<br>OF NESTANI - A GRECIAN VILLA, an<br>Oregon limited liability company, | Civ. No. 08-790-AA |
| Plaintiff, | OPINION AND ORDER |
| v. | |
| STATE FARM FIRE AND CASUALTY<br>COMPANY, | |
| Defendant. | |

Dwain M. **Clifford**
Ball **Janik LLP**
101 SW Main Street, Suite 1100
Portland, OR 97204
    **Attorney for plaintiff**

**Thomas A. Gordon**
Andrew S. **Moses**
Brian C. Hickman
**Gordon & Polscer, LLC**
9755 SW Barnes Road, Suite 650
Portland, OR 97225
    **Attorneys for defendant**

**1** – OPINION AND ORDER

AIKEN, Chief Judge:

Plaintiff, Association of Unit Owners of Nestani, brings this action to recover under a **Condominium/Association** Policy ("Policy") issued by defendant for loss sustained at its condominiums (**"Nestani"**). Plaintiff alleges that this loss is covered under the Policy as a collapse caused by hidden decay of weight-bearing structural members and seeks benefits of $5,078,320.25, costs and disbursements, and attorneys' fees. Defendant denies that the Policy covers the alleged conditions at Nestani.

Defendant moves for summary judgment on the grounds that the claimed loss did not occur during the Policy period, and that any loss did not arise from a collapse caused by hidden decay as defined in the Policy. In the alternative, defendant moves for partial summary judgment on the scope of coverage for repairs, the scope of **defendant's** payment obligation, and the timing of defendant's payment obligation.

Plaintiff opposes defendant's motions and moves to strike exhibits attached to the Declaration of Brian C. **Hickman.**

## I. Factual Background

Plaintiff is an Oregon non-profit corporation organized under the Oregon Condominium Act, Or. Rev. Stat. § 100.005, et seq. In 1982, plaintiff constructed seven multiplex buildings, containing 54 residential units, at 3202-3408 NE 29th Street, Gresham, Oregon. Poor stucco and roof installation allowed water to seep in at

2 - OPINION AND ORDER

numerous locations throughout Nestani. Following discovery of these leaks, plaintiff made several repairs.

In 1998, plaintiff hired **Farwest** Construction ("Farwest") to identify and fully remedy all needed repairs. From June 15, 1999 to July 7, **1999, Farwest** inspected the exterior "envelope" of the buildings. Following this inspection, **Farwest** prepared a report for plaintiff that stated in part: 1) the condominium walls suffered from "long term dramatic water **intrusion"** and likely contained substantial dry rot; 2) the privacy fences were saturated with water and **"expose[d]** the building structures to significant water intrusion and subsequent **damage";** 3) four internal support posts were rotted to the point of being hollow; 4) the majority of the condominium units exhibited elevatedmoisture readings, many in the range of 90-100%; 5) leaks were found at all wall and roof junctions, chimneys, vents, roof decks, and the problems were "much more advanced than anyone believes at this point." **Hickman** Decl. Ex. 29.

Following the receipt of Farwest's report, plaintiff filed a claim for "collapse caused by hidden decay" with defendant in 1999. Defendant investigated and denied plaintiff's claim. After defendant denied coverage, plaintiff alleges that it paid **Farwest** to repair all damages caused by water seepage known to plaintiff at the time.

In 2000 and 2001, plaintiff received written complaints from

at least three unit owners, including a Nestani board member, stating that **Farwest** was not repairing the damage properly or addressing existing rot.   In 2000, plaintiff observed rot in one unit and received a report of rot in another unit.   Plaintiff again retained **Farwest** to perform additional repairs at the Nestani units.

From 2000 to 2001, Faswest installed a new roof.  However, the roof installed by **Farwest** was apparently defective and caused further leaks.   Plaintiff again instructed **Farwest** to repair all known damages and other problems related to moisture and rot.

Subsequent to **Farwest's** repairs, plaintiff purchased a **Condominium/Association** Policy from defendant effective January 1, 2005 through January 1, 2007.   In the first year, the Policy provided 54,892,600 for building and auxiliary structure coverage and $10,400 for business personal property.   In the second year, the Policy provided $5,075,600 for building and auxiliary structure coverage and $10,900 for business personal property.

Plaintiff alleges that in or around November 2006, it discovered that hidden decay had caused portions of the supporting and weight-bearing structural members of the condominium buildings to crumble into pieces.  Plaintiff sought coverage under the Policy for such damage, claiming defendant agreed to insure plaintiff for the collapse of any part of a building caused by "hidden decay of a supporting or weight-bearing structural member of the building."

4 – **OPINION** AND **ORDER**

On July 5, 2007, a State Farm claims representative inspected plaintiff's property, and State Farm consultants tested the buildings to determine the estimated losses and scope of **defendant's** duty to pay the costs of repairs. Defendant admitted coverage "under the collapse provision of the policy" for certain units and locations, but denied coverage for all "remaining **damages."** Under this assessment of damages, defendant paid $11,297.75 in benefits, minus the $10,000 deductible under the Policy.

**On** June 4, 2008, plaintiff filed this action to obtain damages of $5,078,320.25, and in addition prejudgment interest, costs and fees. Plaintiff demands full coverage under the Policy for collapse caused by hidden decay, and alleges that defendant breached the Policy by wrongfully refusing to pay the demand.

## II. Standard of Review

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of **law."** Fed. R. Civ. P. 56(c). The materiality of a fact is determined by the substantive law on the issue. T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987). The authenticity of a dispute is determined by whether the evidence is such that a reasonable jury could return a verdict for the

nonmoving party.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).

The moving party has the burden of establishing the absence of a genuine issue of material fact.  <u>Celotex Corw. v. Catrett</u>, 477 U.S. 317, 323 (1986).  If the moving party shows the absence of a genuine issue of material fact, the nonmoving party must go beyond the pleadings and identify facts which show a genuine issue for trial.  <u>Id.</u> at 324.

Special rules of construction apply to evaluating summary judgment motions: (1) all reasonable doubts as to the existence of genuine issues of material fact should be resolved against the moving party; and (2) all inferences to be drawn from the underlying facts must be viewed in the light most favorable to the nonmoving party.  <u>T.W. Elec.</u>, 809 F.2d at 630.

## III. Discussion

Defendant moves for summary judgment on plaintiff's breach of contract claim.  Defendant maintains that plaintiff fails to prove that the loss at Nestani commenced during the Policy or within the two-year limitations period under the Policy.  Defendant also argues that plaintiff's loss does not fit within the coverage for a sudden, entire collapse caused by hidden decay.  In response, plaintiff relies on defendant's expert testimony to show that the loss commenced during the Policy period and within the two-year limitation period.  Plaintiff also argues that the loss fits within

the extension of coverage for collapse caused by hidden decay, because portions of structural members have crumbled and fallen into pieces.

In disputes involving insurance policies, the insured has the initial burden of establishing conditions of coverage, the insurer has the burden of proving that the policy excludes coverage, and the burden to show an exception to an exclusion falls back upon the insured. <u>Employers Ins. of Wausau v. Tektronix, Inc.</u>, 211 Or. App. 485, 509-14, 156 P.3d 105 (2007).

Plaintiff fails to establish that it meets the conditions of coverage under the Policy, or that its loss is covered as an exception to the exclusion for decay. Accordingly, summary judgment is granted.

**A.** <u>Plaintiff Fails to Show Loss Commenced During Policy Period or its Action was Brought Within Two-Year Limitation Period</u>

The Policy provides coverage for loss to property "commencing during the policy period." The Policy further requires that legal action be brought "within two years after the date on which the accidental direct physical loss occurred." As these are conditions on coverage, plaintiff carries the burden of proof. <u>Tektronix</u>, 211 Or. App. at 509.

Defendant argues that regardless of whether plaintiff's loss constitutes a covered collapse under the terms of the Policy, plaintiff's loss "commenced" when the first instance of collapse caused by hidden decay occurred. Plaintiff responds that its loss

"commenced" each time portions of supporting structural members
crumbled into pieces, and the record reflects multiple instances of
"collapse" "commencing" before and during the Policy period.   In
other words, for defendant, "commencing" means the first occurrence
of the type of loss claimed, whereas for plaintiff, "commencing"
refers to each occurrence of the loss in a series of multiple
losses.

     I find each party's definition plausible, rendering the term
"commencing" ambiguous.   Accordingly, the court must determine the
reasonableness of the interpretations in the light of the term's
specific context and the broader context of the Policy as a whole.
Hoffman Constr. Co. of Alaska v. Fred S. James & Co. of Or., 313
Or. 464, 470-71, 836 P.2d 703 (1992).   Defendant and plaintiff do
not discuss the context of "commencing," and the term's context
does little to resolve the ambiguity.   Thus, an ambiguous term,
such as "commencing," should be construed against the insurer.   See
id.; see also N. Pac. Ins. Co. v. Hamilton, 332 Or. 20, 29, 22 P.3d
739(2001) ("It is the insurer's burden to draft exclusions and
limitations that are clear.").   Here, if defendant wanted to limit
"commencing" to mean the first occurrence of a type of loss during
the Policy period, it could have done so.   See, e.g., USF Ins. Co.
v. Clarendon Am. Ins. Co., 452 F. Supp. 2d 972, 987 (C.D. Cal.
2006) (an insurance company limited coverage to damage first
occurring during the policy period).   Here, "commencing" may be

reasonably read to include each identifiable instance of collapse,

regardless of whether similar loss occurred prior to the Policy

period.

However, plaintiff fails to prove that any identifiable loss

commenced during the effective Policy period, January 1, 2005

through January 1, 2007.  Repeatedly, plaintiff's experts denied

that it was possible to prove when the purported collapse of

structural members occurred.  Muneer Gores, plaintiff's rebuttal

expert, testified:

> I don't know of anybody that I have worked with, whether
> it's an engineer or architect or forensic architect, that
> can tell me when dry rot or gyp sheathing started to
> crumble into pieces.  There is just no way to tell
> exactly when it happened.

Hickman Decl. Ex. 40 at 16:21-25.  Mark Rose, another plaintiff's

expert, concurred:

> Q: And do I understand that at none of the locations
> you can identify a time frame, for example, within two
> years of when the collapsed state is reached?
> A: I think you are getting to a point that it's -
> you are now moving to an area, to a period of time,
> that's just too small.  It's a guesstimate at best and
> mere speculation at most.

Hickman Decl. Ex. 41 at 101:15-21.

In response, plaintiff relies on another portion of Rose's

deposition to show that the damages could have occurred during the

Policy period:

> Q: If it's an ongoing failure, then with that kind
> of guess or that kind of speculation, would there have
> been some damages and some rot that had caused structural
> members to fall into pieces during 2005?

9 - OPINION AND ORDER

> A: Absolutely.
> Q: And the same for the following year, in 2006?
> A: Yes.
> Q: And in 2007?
> A: Yes.

Clifford Decl. Ex. 2 at 240:9-17.    However, Rose based his "speculation" on "guesstimates," and warned "you are never going to get within a year or two.''    Clifford Decl. Ex. 2 at 240:3-4.    In fact, Rose further testified that:

> Q: Do I understand you correctly that the decay in the majority of the locations likely began before '05? '05 wasn't the start of this; is that correct?
> A: Yes, very likely even before '05.
> Q: Okay.    And that some of these exploratory openings, the conditions crossed the threshold of what you are considering a collapse, that likely occurred prior to '05?
> A: Based on the conditions, I would say that a lot of the gypsum sheathing conditions and some of the extent of the damage to the stud framing has been going on even before '05.    But, I mean, we are starting to get into a very, very, vague area now of trying to pinpoint when it actually occurred.    We could have even had structural collapse to the gypsum sheathing as early as year three or four of the initial completion of the project.    You just don't know for sure when it started to occur.

Hickman Decl. Ex. 41 at 241:19-242:11.    Therefore, Rose's testimony does not support plaintiff's argument.

Plaintiff also relies on defendant's expert, James Perrault, who testified that structural members began falling into pieces as early as the middle 1990s, but that such damage was progressive in nature, and portions of some structural members "probably" fell into pieces during 2005 and 2006.    Clifford Decl. Ex. 1 at 91:6-92:25.    Perrault based this conclusion on inspection reports, his

10 - OPINION AND ORDER

own investigation, and review of plaintiff expert reports. Clifford Decl, Ex. 1 at 91:18-20. However, **Perrault's** testimony that portions of structural members "probably" fell into pieces during the Policy period does not create a genuine issue of fact. "While we must draw all reasonable inferences in favor of the non-moving party, we need not draw inferences that are based solely on speculation." <u>LVRC **Holdings** LCC v. **Brekka**</u>, 2009 WL 2928952, at *7 (9th Cir. Sept. 15, 2009) (citing <u>Lujan v. **Nat'l** Wildlife Fed'n</u>. 497 U.S. 871, 888-89, 110 **S.Ct.** 3177 (1990)). In response to defendant's **summary** judgment motion, plaintiff can no longer rest on "mere allegations," but must **"set** forth" by affidavit or other evidence "specific **facts." Fed.** R. Civ. **P.** 56(e); <u>see Lujan</u>, 497 U.S. at 889 (holding that courts cannot presume specific facts to support a general allegation).

Here, plaintiff has the burden to set forth specific facts to show loss **commencing** during the Policy period. Plaintiff does not, and, according to its own experts, cannot identify a specific instance of collapse that occurred during the Policy period; thus, I would have to assume, based on speculative probability, that a structural member fell into pieces during the Policy period. The court cannot take such a leap.

For the same reasons, plaintiff fails to show that it brought legal action within two years after the date on which the property loss occurred. Under the statutorily mandated language of the

Policy, actions brought more than two years after occurrence of the loss are barred.  Hickman Decl. Ex. 1 at 16; see Or. Rev. Stat. § 742.240; see also Or. Rev. Stat. § 742.202.  Plaintiff filed its Complaint on June 4, 2008.  Thus, any covered loss must have occurred after June 4, 2006.

Defendant argues that any loss was caused by severe decay that began decades ago, and that plaintiff cannot prove that the loss occurred after June 4, 2006.  Plaintiff again maintains that the inception of loss is each instance of collapse, and that Perrault's testimony creates a genuine issue of fact that instances of collapse occurred after June 4, 2006.  Plaintiff is correct that the inception of loss begins at the point of collapse, not the point of decay, See Hennessy v. Mut. of Enumclaw Ins. Co. 228 Or. App. 186, 195, 206 P.3d 1184 (2009).  However, Perrault's speculative deposition testimony does not create a genuine issue of fact for summary judgment.  Plaintiff fails to present specific facts showing that an instance of loss occurred after June 4, 2006.  Accordingly, plaintiff cannot show that it brought suit within two years after occurrence of the loss to meet that condition of coverage.

B. Whether Plaintiff's Claim is Covered as a Collapse Caused by Hidden Decay

Even if Perrault's testimony suffices to create a genuine issue of fact as to loss during the Policy period or loss after the two-year limitation on legal action, plaintiff fails to show

12 - OPINION AND ORDER

coverage under the extension of coverage for collapse.

The Policy expressly excludes losses caused by (1) corrosion, decay, deterioration; (2) hidden or latent defect of any quality in property that causes it to damage or destroy itself; (3) continuous or repeated seepage or leakage of water or presence or condensation of humidity, moisture or vapor, that occurs over a period of time; and (4) collapse, except as otherwise provided. Under the "Extensions of Coverage" section, defendant provides coverage for:

Collapse. We insure only for direct physical loss to covered property involving the <u>sudden, entire</u> collapse of a building or any <u>part</u> of a building.

Collapse means actually fallen down or fallen into pieces. It does not include settling, cracking, shrinking, bulging, expansion, sagging or bowing.

The collapse must be directly and immediately caused only by one or more of the following:

. . .

b. hidden decay of a supporting or weight-bearing structural member of the building;

<u>Hickman</u> Decl. Ex. 1 at 12, 20 (emphasis added). Thus, the extension of coverage for **"collapse"** caused by "hidden decay" is an exception to the general exclusion of "collapse." Defendant contends that no "sudden" or "entire" "collapse" occurred.

<u>1.    Whether the Conditions at Nestani Constitute a "Collapse" Under the Policy</u>

Drawing directly from the Policy definition, defendant argues that a loss involving "collapse" is only covered if a building or part of a building suddenly and entirely falls down or into pieces,

13 - OPINION AND ORDER

Defendant maintains no such "collapse" occurred at Nestani.

In turn, plaintiff suggests that the court define "collapse" to provide coverage if any part of the building "sustained substantial impairment to its structural integrity." See Malbco Holdings, LLC v. AMCO Ins. Co., 629 F. Supp. 2d 1185, **1196 (D.** Or. **2009).** In Malbco, the policy defined collapse as "an abrupt falling down or caving in of a building or any part of a building with the result that the building or part of a building cannot be occupied for its intended purpose." Id. at **1190.** In part because of the occupancy requirement, the district court found the definition ambiguous and construed the term against the insurer to mean "substantial **impairment** to structural integrity." Id. at 1195-96. In adopting this broader definition, the district court predicted that Oregon state courts would do the same if faced with an ambiguous collapse endorsement. Id. (citing Richardson v. Travelers Prop. Cas. Ins. Co., 2004 WL **1173186, a t** *3 (D. Or. May 25, 2004); and Schrav v. Fireman's Fund Ins. Co., **402** F. Supp. **2d** 1212, 1214 (D. Or. 2005)).

However, on the same day of the Malbco decision, the Oregon Court of Appeals decided the first Oregon state case to interpret a policy provision for collapse coverage. See Hennessy, 228 Or. App. 186. In Hennessy, the relevant policy did not define collapse, other than to exclude "settling, cracking, shrinking, bulging, or expansion." Id. at 192. The defendant contended that

a collapse involved a complete and total falling down.  Id.  The
plaintiff did not offer an alternative construction of the term
"collapse" but asked for it to be construed against the defendant.
Id.  The court turned to the plain meaning of the term **"collapse"**
and found the term ambiguous.  Id. at 193.  Thus, the court
construed "collapse" against the defendant and held that it
"required only that an object fall some distance." Id.  Notably,
the Hennessy court did not construe **"collapse"** to mean "substantial
impairment to [a **building's**] structural integrity."  Thus, **I**
decline **plaintiff's** suggestion to follow Malbco and instead **look** to
the Policy definition.

When such a term as "collapse" is defined in a policy, the
court looks to this as proof of parties' intent.  See Hoffman, 313
Or. at 469.  Here, the Policy defines "collapse" as "actually
fallen down or fallen into pieces."  Defendant's expert described
conditions in his deposition that meet this definition.
Specifically, Perrault described the framing and gypsum sheathing
as "bad . . . severely deteriorated and crumbled," and the end
studs of the privacy wall and the bottom plate of the privacy wall
as "completely decayed away and . . . crumbled into piece[s]."
Clifford Decl. Ex. 1 at 72:6-10, 70:1-4.  **Perrault's** description of
the conditions at Nestani arguably meets the definition of
"collapse" as defined by the Policy, creating a genuine issue of
fact to survive **summary** judgment on this ground.

2.    Whether the Conditions at Nestani Constitute a "Sudden"
"Collapse"

Defendant next argues that even if a "collapse" occurred, it was not "sudden."  Unlike "collapse," "sudden" is undefined in the Policy, so the court first looks to the plain meaning, and then the context of the Policy as a whole to interpret the term.  Hoffman, 313 Or. at 470.

Plaintiff urges this court to adopt the meaning of "sudden" found in St. Paul Fire & Marine Insurance Co. v. McCormick & Baxter Creosotina Co., 324 Or. 184, 213, 923 P.2d 1200 (1996).  There, the Oregon Supreme Court rejected an argument that sudden had a temporal element and instead held that "sudden and accidental" in a pollution exclusion clause was "synonymous with 'unintended and unexpected.'"  Id. at 214.  The Court found that regular business practices over decades could therefore lead to "unintended and unexpected" contamination of groundwater and soil under the relevant policy.  Id. at 216.

Defendant argues that the differing context in McCormick renders the Court's definition of "sudden" inapplicable to this case.  Defendant maintains that "sudden" has a temporal element in the context of a collapse endorsement and necessarily means "abrupt," thus precluding a gradual "collapse" such as that alleged by plaintiff.  Defendant emphasizes that the Policy covers a "sudden" collapse in contrast to the excluded conditions of "settling, cracking, shrinking, bulging, expansion, sagging or

16 - OPINION AND ORDER

bowing," as well as the exclusion for water damage that occurs "over a period of time." Defendant also cites <u>Malbco</u>, where the district court construed **"abrupt"** to mean "sudden" in a collapse coverage clause. <u>Malbco</u>, 629 F. Supp. 2d at 1195.

Given the context of the Policy, I find persuasive defendant's argument that "sudden" in the collapse coverage clause has a temporal element. I thus interpret "sudden" in this context to mean "marked by or manifesting abruptness or haste" or "made or brought about in a short time." <u>Merriam-Webster's Collegiate Dictionary</u> 1248 (11th ed. 2004). Accordingly, conditions that gradually lead to collapse are excluded under the Policy, and only "sudden" collapses are covered under the extension of coverage for collapse. Given the undisputed facts that any **"collapse"** at Nestani resulted from water damage and decay "occurring over a period of time," this "collapse" was not **"sudden"** under the terms of the Policy. Plaintiff's claimed loss therefore does not meet the terms of the extension of coverage for collapse.

<u>3.    Whether the Conditions at Nestani Constitute an "Entire" "Collapse" of "Any Part of a Building"</u>

Defendant further argues that the word "entire" as applied to **"collapse"** requires that a building or a part of a building **completely** fall to the ground or completely fall into pieces and necessarily excludes the crumbling or falling down of a portion of a structural member. Defendant maintains and plaintiff concedes that no entire part of a building has completely fallen down or

crumbled into pieces at Nestani.  Plaintiff's expert Rose testified
as follows:

> Q: Are you aware of any locations where an entire
> piece of gypsum sheathing or an entire framing member has
> fallen into pieces?
> A: No.

Hickman Decl. Ex. 41 at **191:22-25.**

Plaintiff nonetheless contends that "any part of a building"
in the Policy should be construed to cover portions of studs and
portions of gypsum sheathing that crumbled into pieces.  Plaintiff
relies on **Perrault's** deposition testimony that portions of
structural members, such as stud ends and four-by-four bottom
plates, have completely decayed away and **crumbled** into pieces.
Clifford Decl. Ex. 1 at 70:1-4.  Plaintiff suggests that if
defendant wanted to exclude collapse for portions or smaller
"parts," defendant could have written such restrictions into the
Policy.

However, plaintiff's proffered definition would rewrite the
Policy to cover the collapse of "portions" of a building as opposed
to an "entire collapse of . . . any part of a building."  In the
context of this Policy, a "part" is "an essential portion or
integral element," whereas the plain meaning of "portion" is "an
often <u>limited wart</u> set off or abstracted from a whole."  <u>**Merriam-
Webster's Colleaiate Dictionarv**</u>, <u>**supra,**</u> at 902-03, 967 (emphasis
added).  An "integral element" is "essential to completeness," <u>id.</u>
at 650, rather than a limited "portion."  Thus, while a covered

18 - OPINION AND ORDER

collapse may include the collapse of an entire structural member, it does not include the collapse of a "portion" of that structural member.    Furthermore, **plaintiff's** interpretation of "part" to include lesser "portions" would render the term "entire" meaningless and be contrary to the mandate that the court give effect to all terms of the Policy.    See Hoffman, 313 Or. at 470-72. Therefore, **Perrault's** testimony describing the collapse of portions of structural members does not describe conditions that constitute an "entire collapse of . . . any part of a building."

Therefore, plaintiff fails to create a genuine issue of fact as to whether conditions at Nestani are covered under the terms of the Policy, and defendant's motion for summary judgment is granted.

## III. Conclusion

For the reasons set forth above, defendant's motion for summary judgment (doc. 42) is GRANTED, rendering defendant's partial motion for summary judgment (doc. 45) moot.    Plaintiff's motion to strike (doc. 53) is DENIED.

IT IS SO ORDERED.

Dated this *30* day of October, 2009.

_____
Ann Aiken
Chief United States District Judge

**19 – OPINION AND** ORDER